**FILED**

MAR 1 5 2007

U.S. BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

In re: ) Chapter 11
)
THE VILLAS AT HACIENDA ) Case No. 4-05-bk-1482-EWH
DEL SOL, INC., )
)
        Debtor. ) **MEMORANDUM DECISION**
)
_____)

## I. INTRODUCTION

    This is the rare case where a liquidated Chapter 11 estate has sufficient funds to make a distribution to equity. What that distribution should be is at the center of a dispute among the shareholders. Two of the shareholders and an entity they control have been paid as creditors. The remaining shareholder has objected to those payments on the grounds that there was an agreement among the shareholders that all shareholder advances to the Debtor were to be treated as equity contributions and, on the grounds that there is no adequate proof that the amounts paid as creditor claims were, in fact, loaned to the Debtor. The dissenting shareholder also asserts that the shareholders had agreed that there would be no repayment of any capital contributions made by or on behalf of any shareholder prior to a general distribution to equity.

    For the reasons explained in the balance of this Memorandum Decision, the objection to payments to the two other shareholders and their entity as creditors is sustained, but capital contributions that have been adequately proven are entitled to be paid prior to any general distribution to equity.

## II. FACTS AND PROCEDURAL HISTORY

The Debtor's equity owners are Martin Collier ("Collier") --- 40% interest, Albert Gersten ("Gersten") --- 40% interest, and David Mason ("Mason") — 20% interest. Gersten and Collier each paid $4,000 for their equity interest when the Debtor was formed. Collier and Gersten claim that a corporation, GC Enterprises ("GCE"), which is owned 50% by a corporation wholly owned or controlled by Collier, and 50% by a corporation wholly owned or controlled by Gersten, made advances to the Debtor. They also claim that GCE or another entity owned or controlled by Collier and Gersten provided the capital necessary to acquire real property ("Property") of the Debtor. Mason provided "sweat" equity for his 20% interest in the Debtor whose business purpose was to acquire and develop the Property as an apartment project.

Consistent with its business purpose, the Debtor acquired the Property for approximately $1.2 million where it began construction on apartments ("Project"), using funds borrowed from the Department of Housing and Urban Development ("HUD"). The Debtor filed its Chapter 11 petition on March 28, 2005, when construction on the Project was ongoing. On the petition date, numerous disputes existed between the Debtor and its general and sub-contractors regarding late payments. Eventually, all of the disputes were resolved. A Modified Plan of Reorganization was proposed by one of the Debtor's creditors which provided for the sale of the Project ("Sale"), for an amount sufficient to satisfy all undisputed creditor claims in full. The Modified Plan was confirmed on February 6, 2006 (DE# 244).

Shortly before the closing of the Sale, a dispute arose among the shareholders regarding how funds were to be distributed from the Sale escrow ("Escrow"). As a result, Mason filed an objection to the proposed distribution of Sale proceeds on April 3, 2006 (DE# 260). The objection was withdrawn, without prejudice, at an April 4, 2006 hearing on the status of the proposed Sale. On April 6, 2006, Mason alleges that the shareholders

2

also entered into a settlement agreement ("Settlement Agreement") which purportedly resolved all pending issues among the shareholders, including issues involving entities other than the Debtor.

The Sale closed on April 12, 2006. That same date, the Debtor filed a "Notice of Proposed Distribution of (I) Payment of All Claims; (ii) Intention to Disburse Remaining Funds to Equity, (iii) Opportunity to Object Thereto; and Motion for Final Decree and Closing of Case" (DE# 265). Attached to that Motion as Exhibit A was a list of creditors which identified "what the Debtor believes to be each and every creditor which held a claim against the Chapter 11 estate." Exhibit A's list included Steven J. Lee ("Lee") as being owed $373,000 and Manchester Development Company[1] as being owed $500,000. Exhibit B to the pleading listed what the Debtor claimed were "insiders and insider-related claim holders" which the Debtor intended to pay and then disburse any remaining amounts to equity. Exhibit B lists Collier & Gersten at $124,856.26 each and GCE at $2,791,674.14.

On May 1, 2006, Mason filed a Renewed Objection to Motion & Distribution to Certain Claims ("Renewed Objection") in which he objected to the following proposed distributions:

1. $2,764,176.78 to GCE on the grounds that it was not a creditor, but rather that any funds provided to the Debtor by GCE were capitalization costs, not loans.

2. $373,000 to Lee on the grounds that he was not a scheduled creditor of the Debtor.[2]

3. $1.25 million to Lewis Cohen ("Cohen"), a scheduled creditor who Mason claimed was not a creditor.

---

[1] Manchester Development is a company wholly owned or controlled by Mason.

[2] The record indicates that Lee never received notice of the Renewed Objection, the continued hearings or the evidentiary hearings on the Renewed Objection.

3

4. any payment individually to Collier and Gersten on the grounds that they were not scheduled creditors and that any advances they made were capitalization costs.[3]

The Renewed Objection also asserted that there were inconsistencies in the Debtor's, then delinquent, monthly reports and the Debtor's operating ledgers which indicated that undisclosed disbursements had been made to GCE. The Renewed Objection requested that all past due operating reports be filed and an accounting provided, including a complete accounting of funds deposited or withdrawn from a "pooled" investment account maintained by GCE where funds from the Debtor had been deposited ("Pooled Account").

The Renewed Objection was set for hearing on May 10, 2006. The hearing was continued at Mason's request until May 30, 2006. On May 26, 2006, Cohen, GCE, Collier and Gersten, all represented by the same attorney, filed objections to the Renewed Objection. Cohen's objection sought an order overruling Mason's objection to his claim. Collier and Gersten objected to this court's jurisdiction over what they claimed was a shareholder dispute.

In conjunction with the Renewed Objection, Mason served document production requests on counsel for Collier, Gersten and GCE (collectively, "GCE Entities"). Discovery disputes then ensued between Mason and the GCE Entities. On August 9, 2006, at a status hearing on those discovery disputes and to set an evidentiary hearing on the Renewed Objection, an oral order ("August 9th Order") was issued requiring the GCE Entities to either file a motion for protective order within two weeks or produce the records requested by Mason within 30 days. Among the documents subject to the August 9th Order were GCE's "audit work paper" supporting its "audit adjustment, which reclassifies

---

[3] GC Management Company, LLC, which is wholly owned or controlled by Collier and Gersten, was appointed as the manager of the Debtor by a May 17, 2005 Order after notice and a hearing. Mason did not object to the appointment which permits GC Management to receive a fee of 3% of gross collections a month from the Project. Mason's claim objection does not include an objection to the payment of management fees. Payments to the management company are presumed to be separate from any distributions made to Collier and Gersten individually.

4

$1.5 million from equity in Villas to debt" and "[s]upporting documents for transactions due to/from accounts between Villas and GC Enterprises." The GCE Entities failed to comply with the August 9th Order.

At the August 9th status hearing, an evidentiary hearing on the Renewed Objection was set for November 7 and 8, 2006. On August 22, 2006, an Evidentiary Hearing Scheduling Order ("Scheduling Order") was issued which set deadlines for the filing of witness and exhibit lists and the filing of a joint pre-hearing statement. The Scheduling Order, which is issued by this court in all cases where evidence will be taken, provides as follows: "Any witnesses and exhibits not timely disclosed will not be heard or admitted into evidence."

On August 17, 2006, Cohen filed a Motion to Set Separate Trial and for Expedited Hearing, which was granted over Mason's objection. Cohen then obtained substitute counsel. The hearing on Mason's objection to Cohen's claim was held on October 19, 2006. On November 27, 2006, an order was entered overruling Mason's objection, which is now on appeal.

On August 30, 2006, Mason filed an Emergency Motion to Require Estate Money to be Put Back into the Debtor's Account ("Emergency Motion") alleging that over $600,000 had been diverted from the Debtor's account for the benefit of the GCE Entities' other business ventures. A separate scheduling order was issued September 13, 2006 setting the hearing for the Emergency Motion for October 23, 2006.

On October 12, 2006, counsel for the GCE Entities filed a motion to withdraw, which was granted on October 15, 2006 because the GCE Entities had consented to the withdrawal (DE#s 328 and 329). On October 23, 2006, the evidentiary hearing on the Emergency Motion was held. No one appeared for the GCE Entities. After evidence was presented, the court entered an order on October 26, 2006 ("Turnover Order"), which required the GCE Entities to pay into the Debtor-In-Possession account all monies in which the Debtor had a possessory interest along with an accounting of all funds in the Pooled

Account. The Turnover Order also stated that failure to comply with the order could result in the civil contempt proceedings against the GCE Entities.

On October 31, 2006, Mason's attorney filed a unilateral pre-hearing statement for the November 7 and 8, 2006 hearing on the Renewed Objection. The accompanying attorney's certification indicated that the GCE Entities failed to comply with the Scheduling Order's deadline for exchanging witness and exhibit lists and failed to participate in the preparation of a joint pre-hearing statement.

At the November 7, 2006 evidentiary hearing on the Renewed Objection, counsel for Mason announced that the parties had reached an agreement "in principal" and requested a postponement of the hearing. No one appeared for the GCE Entities at the November 7, 2006 hearing or at a status hearing on the settlement "in principal" held on November 21, 2006. At the November 21, 2006 hearing, Mason's counsel announced that the settlement had fallen apart. An evidentiary hearing was set for December 18, 2006 on the Renewed Objection and for an Order to Show Cause on why the GCE Entities should not be held in civil contempt for failing to comply with the Turnover Order, which Mason's counsel stated would be promptly filed. All deadlines in the Scheduling Order were extended to conform to the December 18, 2006 hearing date.

Mason's counsel did not file an Application for Order to Show Cause until December 12, 2006 and, therefore, because there was not sufficient notice, the December 18, 2006 hearing proceeded solely on the Renewed Objection. Collier and Gersten appeared without counsel, but because they had failed to comply with the extended deadlines for exchanging witness and exhibit lists, they were not permitted to offer documentary evidence or call witnesses. They were permitted to cross-examine the witnesses called by Mason, including cross-examination about the and to use the documents Mason admitted into evidence. The evidence was not completed on that date, and the hearing was continued until January 16, 2007. The January 16, 2007 date was

also used for the evidentiary hearing on the Amended Application for Order to Show Cause why the GCE Entities should not be held in contempt for failing to comply with the Turnover Order.

On January 11, 2007, a notice of appearance was filed by new counsel for the GCE Entities, who participated in the January 16th evidentiary hearing. At the conclusion of the January 16th evidentiary hearing, the Renewed Objection was taken under advisement. The GCE Entities were not held in civil contempt. The GCE Entities were also excused from compliance with the Turnover Order pending the issuance of a decision on the Renewed Objection.

On January 30, 2007, counsel for Mason and the GCE Entities filed post-evidentiary hearing memoranda on the Renewed Objection. The matter is now ready for decision.

### III. ISSUES

1. Should the GCE Entities' claims be disallowed as creditor claims?
2. Should the GCE Entities' claims or any portion of their claims be allowed as capital contributions entitled to payment prior to general pro-rata distributions to equity?

### IV. JURISDICTIONAL STATEMENT

Jurisdiction is proper under 28 U.S.C. § 1334 and 157(a) and (b)(2)(B) and (O).

### V. DISCUSSION

GCE's claim was scheduled as liquidated, undisputed and non-contingent, and is, therefore, entitled to a *prima facie* assumption of validity under Rule 3003(b)(1). Under that rule, GCE was not required to file a proof of claim documenting its claim. However, the GCE Entities were required by the August 9th Order to provide documentation of any claims they asserted were debt, including any amounts claimed to be due to GCE. They did not do

7

Case 4:05-bk-01482-RTB    Doc 429    Filed 03/15/07    Entered 03/15/07 13:24:02    Desc
Main Document    Page 7 of 15

so. It is well established that the failure of a party to provide evidence peculiarly available to that party supports an inference that the truth would be damaging to that party. In re Furley's Transport, Inc., 272 B.R. 161, 177 (Bankr. D. Md. 2001) (trustee filed motion to compel defendant to produce documents; noting the negative inference, court did not accept defendant's explanation that information was unavailable and not obtainable from other sources); In re Bicoastal Corp., 149 B.R. 212, 214 (Bankr. M.D. Fla. 1992) (defendant's failure to produce information, despite numerous orders of the court, supports negative inference).

Furthermore, the GC Entities failed to properly comply with the court's Scheduling Order, which provides that any failure to comply with the order would result in a bar to calling undisclosed witnesses or using undisclosed exhibits at the evidentiary hearing. Because the GC Entities failed to comply, they were prohibited from offering evidence at the evidentiary hearings held on the Renewed Objection on December 18, 2006 and January 16, 2007 ("Evidentiary Hearings").

At least two of the documents admitted at the Evidentiary Hearings, which were created and/or certified by the GC Entities (Exhibits 3 and 7), demonstrate that a number of the advances made by the GCE Entities were initially treated on the Debtor's books as equity and then later changed to debt. [4] Taken together, the inference that arises from GCE

---

[4] Exhibits 3 and 7 were produced by Gersten and Collier in response to Mason's discovery requests. The documents were reviewed by a certified public accountant called as a witness by Mason. Because the certified public accountant was not disclosed as an expert witness, he was not treated as an expert witness at the Evidentiary Hearing. However, Fed. R. Bankr. P. 9014(c) excepts Fed.R.Civ.P. 26(a)(2) from being applied in contested matters "unless otherwise ordered by the court." Nothing in the Scheduling Order required such a disclosure, so the ruling made at the Evidentiary Hearings that the accountant could not be treated as an expert witness was incorrect. However, even if all of the accountant's testimony, including those parts of it which were based on hearsay or evidence provided by third parties is considered as expert testimony, it only demonstrated that there was a lack of backup documentation to support GCE's book entries. . By itself, that testimony does not demonstrate that the GCE Entities did not make advances to the Debtor. In re Opelika Manufacturing Corp., 66 B.R. 444, 450 (Bankr. N.D. Ill. 1986) (testimony of an expert, even if uncontradicted by another expert, is not conclusive) citing Security First National Bank of L.A. v. Lutz, 322 F.2d 348 (9th Cir. 1963); Del Mar Avionics, Inc. V. Quinton Instrument Co., 836 F.2d

8

Entities' failure to timely produce documentation to support GCE's creditor's claim, as well as the inferences to be drawn from Exhibits 3 and 7, overcome any *prima facie* assumption of validity to GCE's scheduled creditor claim.[5] The burden, therefore, shifted to the GCE Entities to demonstrate that GCE's claim was a valid creditor's claim. They failed to meet that burden.[6]

Mason does not, however, dispute that Gersten and Collier and/or GC Enterprises made advances to the Debtor. In fact, he testified that he understood "they would provide all of the equity for this project."[7] The issue which remains to be decided, therefore, is whether any of the advances should be treated as capital contributions entitled to be paid before the Debtor's equity is distributed ratably among its three shareholders.

This is not, as the GCE Entities assert in their post-hearing brief, an exercise in recharacterizing GCE's claim. See In re Pacific Express, Inc, 69 B.R. 112 (9th Cir. BAP 1986). As Mason pointed out in an earlier pleading in this case: "Here, the advances by the dominant shareholders of Villas were necessary to finance its operations from the outset because the corporation's stated capital was grossly inadequate. . . . The question here is not about recharacterizing or subordinating a loan, but instead it is about determining the substance of the transaction as an original matter. Pacific Express did not

---

court's, not the expert's, responsibility to decide the case") (citation omitted); Minnesota Mining and Manufacturing Co. V. Berwick Industries, Inc., 532 F.2d 330, 333 (3rd Cir. 1976) ("it is axiomatic that the trier of fact is not bound to accept expert opinion, even if it is uncontradicted") (citation omitted).

[5] There is no inference of validity for the unscheduled claims of Collier and Gersten.

[6] At the January 16, 2007 evidentiary hearing and in their post-hearing brief, the GCE Entities' attempt to use the fact that Mason testified at the 341 hearing about the accuracy of the Debtor's Schedules as a bar to any objection to the GCE Entities' creditor claims. While Schedules can be admitted under Fed. R. Evidence 801(d)(2), when offered against the Debtor, those are not the facts of this case. The offer of Mason's testimony at the 341 hearing should have been disclosed under the Scheduling Order. It was not, and, therefore, cannot be considered.

[7] Transcript, 12/18/06, at p. 64, ln. 7-8.

9

consider any such question."[8] The debt versus equity inquiry is not an exercise in recharacterizing a claim, but of identifying -- to begin with -- the advance's true character. See In re Georgetown Bldg., 240 B.R. 124 (Bankr. D.D.C. 1991).

There is no documentary evidence regarding how equity distributions would be made among the Debtor's shareholders. The schedules list Mason as having paid $2,000 for a 20% interest in the Debtor – something which he admitted he never did because he was never asked to do so.[9] Mason testified that he had a "handshake deal" with Collier that would provide him with 20% of the equity in the Debtor in return for his sweat equity. It was his understanding that the GCE Entities would provide all the "non-sweat" equity to the Debtor.[10] According to Mason, there was no requirement that capital contributions, including the acquisition cost of the Property, be repaid prior to equity distributions. Mason, however, has other business arrangements with Gersten and Collier where capital contributions are to be prior to any "profit participation" distribution to the equity. According to Mason, he received a reduced profit participation of 20% in the Debtor, rather than the 40% and/or 50% interest he received in his other deals with Gersten and Collier, because it was "understood" that Gersten and Collier would not be reimbursed for their capital contributions to the Debtor. The only conversations Mason had regarding the terms of his equity interest in the Debtor were with Collier.[11] He did not call Collier or Gersten as a witness and, as noted earlier, there are no corroborating documents.

In addition to his own testimony, Mason relies on what he asserts were the requirements of the HUD loan which funded construction of the Project. According to

---

[8] Mason's Opposition to Motion To Set A Separate Trial at 8, filed August 30, 2006.

[9] Transcript, 12/18/06, at p. 93, ln. 12-17.

[10] Transcript, 12/18/06, p. 64, ln 4-8.

[11] Transcript, 12/18/06, at p. 114, ln. 22-25; p. 115, ln. 1-23.

Mason, these requirements prohibited any insider debt related to the Project.[12] But, even if Mason's assertions are correct, the requirements for HUD financing are not determinative of how equity contributions were to be treated among the shareholders.

Mason admitted that it cost about $21 million to build the Project.[13] It sold for $23 million – $15 million was owed to non-insider creditors.[14] According to Mason, he is, therefore, entitled to receive 20% of the remaining $6 million in sale proceeds, even though he concedes that the net profit from the sale of the property was only $2 million.[15] Mason's assertion -- that he is entitled to 20% on the return of cash equity (all of which had been contributed by the GCE Entities) and 20% of the profits -- is unsupported by any writing or the testimony of any disinterested third party. A court is not required to accept testimony simply because it is the only testimony in the record. The testimony must still be credible. Steel v. Downs, 438 F.2d 310, 312 (8th Cir. 1971) ( "The trier of the facts is not required to accept the uncontradicted testimony of an uncorroborated interested party, although such testimony is not contradicted by other testimony.") (citation omitted); Willis v. State Farm, 219 F3d 715, 720 (8th Cir. 2000) (factfinder is free to disbelieve any witness, even if testimony is uncontradicted or unimpeached); Wilbur-Ellis Co. v. M/V Captayannis "S", 451 F.2d 973, 974 (9th Cir 1972), ("the court is not bound to accept uncontroverted testimony at face value if it is improbable, unreasonable or otherwise questionable" (citing Quock Ting v. United States, 140 U.S. 417, 420-21 (1891)). The court finds that it is not.

Accordingly, the GCE Entities are entitled to be repaid for capital contributions made to the Debtor prior to a pro-rata distribution of the equity to the shareholders. However, they

---

[12] Transcript, 12/18/06, at p. 63, ln. 1-11.

[13] Transcript, 12/18/06, at p. 96, ln. 16-25; p. 97, ln. 1-5.

[14] Id.

[15] Transcript, 12/18/06, at p.97, ln. 15-22.

11

still confront the problem created by their failure to timely produce documentation of those advances. The only evidence in the record which supports a claim for capital contributions is contained in Exhibits 3 and 7.[16] Exhibit 3 is simply a ledger re-classifying equity to debt. It is insufficient to demonstrate that the contributions were actually made. Exhibit 7, however, is a certified financial statement dated January 31, 2003, which lists land acquisition costs for the Property of $1,244,561.39. Mason used Exhibit 7 to demonstrate that the Defendants had improperly reclassified equity as debt.

Mason admitted that he did not contribute the Property or any cash to the Debtor. Therefore, the GCE Entities were the only possible source for the Property acquisition cost. GCE is, therefore, entitled to recover the amount listed on Exhibit 7 for "land acquisition" as a capital contribution prior to any equity division among the shareholders. Accordingly, GCE is entitled to be paid $1,244,561.39 prior to any distributions to equity.

The GCE Entities have conceded that Lee was paid $373,000 Estate funds to pay a GCE debt.[17] They have also conceded that $632,000 has been paid to the GCE Entities from the Debtor's account. Mason admits that Manchester received $500,000 from Estate funds even though Manchester was not a creditor of the Debtor.[18] Debtor's lawyer testified that there is currently about $90,000 in the DIP account. If all amounts, which have been improperly paid out of Escrow or the DIP account are considered, the fund to be divided

---

[16] Because Exhibits 3 and 7 were produced and prepared by the Defendant, they may be considered by the court. Fed. R. Evidence 801(d)(2) (relevant admission of a party, including written assertions, are admissible when offered by an opponent). See, e.g., In re Wolcott, 194 B.R. 477, 483 (Bankr. D. Mont. 1996).

[17] At the Evidentiary Hearing, Mason's counsel stated that Mason sought to have the distribution to Lee "treated as a distribution from Collier and Gersten's equity, rather than the payment of a debt." Transcript, 12/18/06, at p. 7, ln. 2-7. Because Lee was never given notice of the Renewed Objection, he is not bound by the determinations made in this Memorandum Decision. Baker by Thomas v. General Motors Corp., 522 U.S. 222, 237 n.11 (1998) ("In no event . . . can issue preclusion be invoked against one who did not participate in the prior adjudication.") (citing Blonder-Tongue Laboratories, Inc. v. University of Ill. Foundation, 402 U.S. 313, 329 (1971); Hansberry v. Lee, 311 U.S. 32, 40 (1940)).

[18] Transcript, 12/18/06, at p. 87, ln. 5-25; p. 88, ln. 1.

12

among the equity totals $3,364,327.91.[19]  Mason is entitled to 20% of that which is $672,865.00  Manchester has already received $500,000.00, so the balance is $172,865.00.  Mason may request a renewed hearing on the Turnover Order if that amount is not paid to him within ten business days of this decision.

## VI. CONCLUSION

The foregoing constitutes the court's finding of fact and conclusions of law as required by Fed. R. Bankr. P. 7052.  An order consistent with this Memorandum Decision will be entered this date.

Dated this 15th day of March, 2007.

EILEEN W. HOLLOWELL
UNITED STATES BANKRUPTCY JUDGE

Copies of the foregoing mailed this
15th day of March, 2007, to:

Matthew R.W. Waterman, Esq.
Jonathan M. Saffer, Esq.
Snell & Wilmer, L.L.P.
One South Church Ave. #1500
Tucson, AZ  85701-1630
Attorneys for Debtor

Nancy J. March, Esq.
DeConcini McDonald Yetwin & Lacy, P.C.
2525 East Broadway Blvd. #200
Tucson, AZ  85716-5300
Attorneys for Louis S. Cohen

John A. Baade
325 West Franklin St. #123
Tucson, AZ  85701
Attorney for Manchester Development and David Mason

---

[19]  The court's calculations are attached as Exhibit A.

1  Walter F. Wood
2  Walter F. Wood Ltd.
   110 South Church Ave. #4398
3  Tucson, AZ 85701
   Attorney for Manchester Development and David Mason
4
   Phillip R. Rudd, Esq.
5  Kutak Rock LLP
   8601 North Scottsdale Rd., Suite 300
6  Scottsdale, AZ 85253-2742
   Attorneys for Collier, Gersten and GC Enterprises
7
   By_____
8      Judicial Assistant

14

# EXHIBIT A

Monies which should be available for pro-rata distribution to equity -

|  |  |  |
|---|---|---|
| | $ 90,000.00 | - in DIP Account |
| | $ 632,000.00 | - post-sale unauthorized distributions from DIP Account |
| | $ 373,000.00 | - Lee |
| | $ 500,000.00 | - Manchester |
| | $ 124,856.26 | - unsubstantiated capital advances by Collier |
| | $ 124,856.26 | - unsubstantiated capital advances by Gersten |
| * | $ 1,519,615.39 | - unsubstantiated capital advances by GCE |
| Total | $ 3,364,327.91 | |

|  |  |  |
|---|---|---|
| | $ 2,764,176.78 | - paid to GCE |
| - | $ 1,244,561.39 | - Property acquisition cost from Exhibit 7 |
| * | $ 1,519,615.39 | |